Eastern District of Kentucky
**FILED**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**ASHLAND**

APR 1 4 2025

AT ASHLAND
Robert R. Carr
CLERK U.S. DISTRICT COURT

**UNITED STATES OF AMERICA**

**V.**

**INFORMATION NO.** _0:25-4-DLB_
Prohibited Act under 21 U.S.C. § 331(c),
theories of misbranding under 21 U.S.C.
§ 352(a), (f), (o), and penalty under 21
U.S.C. § 333(a)(2)

**MATTHEW TYLER LEWIS**

\*    \*    \*    \*    \*

**THE UNITED STATES ATTORNEY CHARGES:**

## Background and FDA Regulation of Drugs

1. At all relevant times, **MATTHEW TYLER LEWIS** was a licensed physician in the Commonwealth of Kentucky and the owner and operator of Lewis Family Care, a medical practice located in Ashland, Kentucky. He was a practicing Doctor of Osteopathic Medicine.

2. At all relevant times, the United States Food and Drug Administration ("FDA") was the federal agency charged with the responsibility of protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA"). Among the purposes of the FDCA was to assure that human drugs are safe, effective, and bear labeling containing only true and adequate information. The FDA's responsibilities under the FDCA included regulating the manufacture, labeling, and distribution of all drugs shipped or received in interstate commerce, and preventing drugs and devices that were

unapproved for marketing, or which were improperly labeled and packaged, from reaching the marketplace.

3. The FDCA defined "drugs" to include articles intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in humans; articles other than food intended to affect the structure or any function of the body of humans; and articles intended for use as a component of such articles. 21 U.S.C. § 321(g)(1).

4. A "prescription drug" was defined as a drug intended for use by man which, because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary for its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drugs. 21 U.S.C. § 353(b). In addition to requiring the supervision of a licensed medical practitioner for the dispensing and administration of the drug to the ultimate consumer, the FDCA also required additional safeguards for prescription drugs as they moved through the supply chain. These requirements included, among other things, that the drug be handled by a lawful and licensed wholesaler and/or pharmacy and, if the drug was subject to the new drug approval statute, that it bore the FDA-authorized label. 21 U.S.C. §§ 353(e), 352(f), 360eee-1; 21 C.F.R. § 201.100(a), (c).

5. Under the regulatory regime established pursuant to the FDCA, some drugs are "new drugs", which are defined as any drug the composition of which is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended or suggested in the labeling thereof. 21 U.S.C. § 321(p). A new drug must be the subject of a new drug application (NDA), reviewed and approved by FDA,

before it may be distributed in interstate commerce. 21 U.S.C. § 355(a); 21 U.S.C. § 331(d). If there is no NDA, an investigational new drug application must be in effect to permit the drug to be distributed for research purposes. 21 U.S.C. § 355(i); 21 C.F.R. pt. 312. Under certain circumstances, manufacturers can market a generic version of a previously approved drug; however, generic products also require FDA review and approval of an abbreviated new drug application before distribution may commence. 21 U.S.C. § 355(j). It is a prohibited act to introduce an unapproved new drug into interstate commerce. 21 U.S.C. § 331(d).

6.      Under the FDCA, drug manufacturers must register with FDA and list their products so that the agency is aware they are manufacturing, packaging, processing, or holding a regulated product. 21 U.S.C. § 360. They are subject to FDA inspection without a warrant, 21 U.S.C. § 374, and must comply with current good manufacturing practice to assure that their products meet the requirements of the FDCA as to safety and have the identity and strength, and meet the quality and purity characteristics which they purport or are represented to possess. 21 U.S.C. §§ 351(a)(1), 360. It is a prohibited act to fail to register a drug manufacturing facility, and any of the drugs that are introduced into interstate commerce from an unregistered facility are deemed misbranded. 21 U.S.C. §§ 331(p), 352(o).

7.      Under the FDCA, certain drug compounders may be exempt from the requirement that their drugs have FDA approval before being introduced into interstate commerce if they register with FDA as an outsourcing facility and only compound from bulk drug substances that are manufactured in FDA registered facilities. 21 U.S.C. § 353b.

Licensed physicians also may legally compound drugs for individual patients as long as the drug is compounded from bulk ingredients that are manufactured in an FDA-registered facility and accompanied by a certificate of analysis. 21 U.S.C. § 353a (a)(1)(A), (b)(1)(A)(ii),(iii).

8. Under the FDCA, all drugs have requirements for their labels and labeling. A label is defined as a written, printed, or graphic matter upon the immediate container of the drug. 21 U.S.C. § 321(k). A drug's label must list the name and place of business of the manufacturer, packer, or distributor, including a street address and zip code. 21 U.S.C. § 352(b); 21 C.F.R. § 201.1(i). It also must list the name and quantity of each active and inactive ingredient, 21 U.S.C. § 352(e)(ii), as well as expiration dates supported by stability studies and lot numbers capable of tracing the drug's manufacturing history. 21 U.SC. § 352(c); 21 C.F.R. §§ 201.17, 201.18, 211.137.

9. Under the FDCA, all drugs must also bear labeling that contains "adequate directions for use", which was defined as "directions under which the layman can use a drug safely and for the purposes for which it is intended." 21 U.S.C. § 352(f); 21 C.F.R. § 201.100. Prescription drugs by definition cannot be used safely by a layperson and must qualify for an exemption to move in interstate commerce. The exemption, set forth in 21 C.F.R. § 201.100, requires that *all* its conditions be met including that the drug at all steps in distribution must: (1) be lawfully in the possession of a wholesaler, retail pharmacy or physician; (2) bear a label of the drug that says "Rx only", the recommended dosage, and an identifying lot or control number from which it is possible to determine the drug's complete manufacturing history; (3) have labeling within the package that bears adequate information for its use including

indications, effects, dosages, routes, and frequency of administration, and any relevant hazards, contraindications, side effects, and precautions for practitioners licensed by law to administer the drug to use the drug safely; and, (4) bear the FDA-authorized labeling if it is a new drug that is required to have FDA approval before marketing.

10.    The FDCA also prohibited the receipt in interstate commerce of any misbranded drug and the delivery or proffered delivery of that drug for pay or otherwise. 21 U.S.C. § 331(c).

11.    Under the FDCA, a drug was misbranded if:

    a.  its labeling was false or misleading in any particular;

    b.  its labeling failed to provide adequate directions for use and adequate warnings;

    c.  the drug was manufactured, prepared, propagated, compounded or processed in an establishment not registered with the Secretary of Health and Human Services.

21 U.S.C. § 352(a), (f), (o).

## The Drug

12.    The FDA approved three different drugs containing the active ingredient semaglutide, all of which were manufactured by Novo Nordisk. In 2017, the FDA approved Ozempic, a once-weekly semaglutide injection used to improve blood sugar levels in adults with type 2 diabetes mellitus. In 2020, the FDA approved Rybelsus, a pill form of semaglutide used to improve blood sugar in adults with type 2 diabetes mellitus. In 2021, the FDA approved Wegovy, an injectable semaglutide drug for weight loss. The injectable semaglutide

drugs were provided in single-patient-use or single-dose pens that provided pre-measured dosages of the drug.

13.    The FDA did not approve any generic semaglutide drugs.

14.    The labeling of the FDA approved semaglutide drugs were required to contain a "black box warning," which is the FDA's most stringent warning for drugs. Black box warnings alert the public and health care providers to serious side effects, such as injury or death. The black box warning for Ozempic, the FDA approved drug, is: **"RISK OF THYROID C–CELL TUMORS. In rodents, semaglutide causes thyroid C-cell tumors. It is unknown whether Ozempic causes thyroid C-cell tumors, including medullary thyroid carcinoma, in humans as the human relevance of semaglutide-induced rodent thyroid C-cell tumors has not been determined. Ozempic is contraindicated in patients with a personal or family history of MTC or in patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2). Counsel patients regarding the potential risk of MTC and symptoms of thyroid tumors (4,5,1)."**

### Dr. MATTHEW TYLER LEWIS'S Weight Loss Clinic

15.    In or about May 2023, **LEWIS** began offering a weekly weight loss clinic on Fridays at Lewis Family Care.

16.    From in or about May 2023 to on or about November 26, 2023, **LEWIS** purchased semaglutide from an entity called "Swole as Fuck Research" (SAF Research) in California, which later changed its name to Research Chemical Supply Research (RCS Research). Neither SAF Research nor RCS Research was registered with FDA as drug manufacturers or outsourcing facilities of prescription drugs and neither held an approved new

drug application for a semaglutide drug nor was authorized to distribute semaglutide as an investigational new drug for human use. Neither entity was a licensed pharmacy or a licensed prescription drug wholesaler.

17.     In or about November 2023, **LEWIS** switched his semaglutide supplier. He began purchasing semaglutide from Stone Mountain Research in Georgia because he could obtain the product for one-fourth of the amount he had been paying RCS Research. Stone Mountain Research was not registered with FDA as a drug manufacturer or an outsourcing facility of prescription drugs, did not hold an approved new drug application for a semaglutide drug, and was not authorized to distribute semaglutide as an investigational new drug for human use. Stone Mountain Research also was not a licensed pharmacy or licensed prescription drug wholesaler.

18.     **LEWIS** purchased the non-FDA approved semaglutide drug via the supplier websites and paid for the drugs using Venmo, Afterpay, or via the phone.

19.     The non-FDA approved semaglutide drug arrived at Lewis Family Care packaged in a vial. Depending on the supplier, many of the vial labels stated either: "SEMAGLUTIDE 5 MG, THIS CHEMICAL IS INTENDED FOR LAB RESEARCH AND DEVELOPMENT ONLY. NOT FOR HUMAN USE. LAB TESTED 99% PURE" or "STONE MOUNTAIN RESEARCH, SEMAGLUTIDE 5 MG, LAB TESTED 99% PURE. THIS CHEMICAL IS INTENDED FOR LAB RESEARCH AND DEVELOPMENT ONLY NOT FOR HUMAN USE."

20.    **LEWIS** saw these labels on the vials and was aware that the labels expressly stated the vial contents were not for human use.  **LEWIS** continued to order the semaglutide from each supplier despite this awareness.

21.    **LEWIS** instructed his staff to place the non-FDA approved semaglutide in his office after the drugs arrived in the mail. He directed members of his staff to draw up the semaglutide on Thursdays in his office and keep the drawn-up drugs in his office refrigerator, separate from all other drugs. No other drugs were kept in his office.

22.    On Fridays, patients visited the weight loss clinic. Patients had to sign forms/labeling that asked them to certify that they did not have certain conditions that would preclude them from taking semaglutide as well as acknowledge the potential side effects.  The form/labeling also stated the dosing regimen, which was similar to Wegovy, the FDA-approved semaglutide drug. Patients were not told that the semaglutide drug they were receiving was not FDA-approved, did not come from a licensed pharmacy or registered manufacturer of bulk drug product or outsourcing facility for compound drugs, or that it was labeled as a "CHEMICAL . . . INTENDED FOR LAB RESEARCH AND DEVELOPMENT ONLY" and "NOT FOR HUMAN USE".  Patients received non-FDA approved semaglutide injections administered by members of Lewis Family Care's staff.

23.    Patient weight loss clinic files were maintained in paper form, separate from Lewis Family Care's electronic filing system for its legitimate practice.

24.    From May 21, 2023 to February 29, 2024, **LEWIS**'s weight loss clinic earned $249,044.40.

## Count 1
### 21 U.S.C. §§ 331(c), 352(a), (f), (o), and 333(a)(2)

25.    Paragraphs 1 through 24 of this Information are re-alleged and incorporated by reference as if set forth fully herein.

26.    From on or about May 21, 2023 through on or about February 29, 2024, in Boyd County, in the Eastern District of Kentucky, and elsewhere,

**MATTHEW TYLER LEWIS,**

with the intent to defraud and mislead, received in interstate commerce and offered for sale, the drug Semaglutide that was misbranded for having labeling that was false and misleading in any particular; having been manufactured, prepared, propagated, compounded or processed in an establishment not registered with the Secretary of Health and Human Services; and for having labeling that did not bear adequate directions for use, in violation of 21 U.S.C. §§ 331(c), 333(a)(2), and 352(a), (o), and (f).

## FORFEITURE ALLEGATION
### 21 U.S.C. § 334
### 28 U.S.C. § 2461

1.    By virtue of the commission of the of the offenses alleged in this Information, **MATTHEW TYLER LEWIS** shall forfeit to the United States the misbranded drugs that were shipped to the Eastern District of Kentucky from locations throughout the United States in violation of 21 U.S.C. §§ 331(c), 333(a)(2), and 352(a), (o), and (f). Any and all interest that **MATTHEW TYLER LEWIS** has in this property is vested in and forfeited to the United States pursuant to 21 U.S.C. § 334 and 28 U.S.C. § 2461.

2.    Because, as a result of the acts and/or omissions of **MATTHEW TYLER**

**LEWIS**, some of the above-described misbranded drugs cannot be located upon the exercise of due diligence and/or have been transferred and/or sold to third parties, the United States is entitled to a forfeiture money judgment against **MATTHEW TYLER LEWIS**, pursuant to 21 U.S.C. § 853(p), in the amount of $249,044.40, which represents the amount of proceeds that he obtained in exchange for the subject misbranded drugs and, in turn, the value of the misbranded drugs that that he received, sold, and/or dispensed in violation of 21 U.S.C. §§ 331(c), 333(a)(2), and 352(a), (o), and (f) and that are unavailable for forfeiture.


**PAUL C. McCAFFREY**
**ACTING UNITED STATES ATTORNEY**

## **PENALTIES**

**COUNT 1:**  Not more than 3 years imprisonment, $250,000 fine, and 1 year supervised release.

**PLUS:**  Mandatory special assessment of $100.

**PLUS:**  Restitution, if applicable.

**PLUS:**  Forfeiture, if applicable.