UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

CRIMINAL ACTION NO. 0:25-CR-004-DLB-01

UNITED STATES OF AMERICA                                              PLAINTIFF

V.           **UNITED STATES'S SENTENCING MEMORANDUM**

MATTHEW TYLER LEWIS                                              DEFENDANT

\* \* \* \* \*

Matthew Lewis should receive a sentence of 15 months – the midpoint of the guideline range. A 15-month sentence is "sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and afford adequate deterrence. 18 U.S.C. § 3553(a).

## I. THE FEDERAL GOVERNMENT REGULATES PRESCRIPTION DRUGS TO PROTECT THE PUBLIC.

The Food and Drug Administration (FDA) "protect[s] the public health by ensuring the safety, efficacy, and security of human . . . drugs." *What we do*, FDA.GOV, https://www.fda.gov/about-fda/what-we-do. To protect public health, the FDA regulates all aspects of prescription and over-the-counter drugs, including their approval, manufacturing, labeling, and distribution. The FDA's regulatory framework shields Americans from counterfeit, subpotent, substandard, adulterated, misbranded, and expired drugs.

The FDA generally requires new drugs, like semaglutide, to receive FDA approval before they can be used on patients in interstate commerce. 21 U.S.C. § 355. Drug manufacturers are required to register with the FDA to ensure that they are complying with approved standards in manufacturing, packaging, processing, and holding a regulated drug. [PSR ¶ 9]. Drug manufacturers assure their products meet safety requirements, including that the drugs are what

1

they purport to be by meeting identity, strength, quality, and purity characteristics. *Id.* They are required to report adverse events and document, report, and correct issues with their drugs. *See* 21 U.S.C. § 355(k), 21 C.F.R. §§ 314.80, 211.192, 211.198. The FDA ensures these safety requirements are met, in part, by warrantless inspections of manufacturing factories. [PSR ¶ 9].

American physicians, entrusted with patient safety, routinely order approved prescription drugs for office use from licensed wholesale drug distributers. *Check Licensure of Wholesale Drug Distributors and Third-Party Logistics Providers*, FDA.GOV, https://www.fda.gov/drugs/drug-supply-chain-integrity/check-licensure-wholesale-drug-distributors-and-third-party-logistics-providers (last visited July 28, 2025). These drugs must have a label with a barcode containing the National Drug Code (NDC), serial number, lot number, and expiration date. This barcode facilitates product tracing throughout the supply chain. Physicians are required to purchase approved prescription drugs from licensed wholesale drug distributers because "[u]nlicensed and unauthorized [drug sellers] put patients at risk of taking unsafe, possibly illegitimate drugs that may be counterfeit, stolen[,] or diverted."[1] *Id.*

Physicians may also obtain compounded prescription drugs for office use from outsourcing facilities.[2] Outsourcing facilities must be registered with the FDA and may only compound sterile

---

[1] The Kentucky Board of Pharmacy maintains a user-friendly licensure verification search function on its website: https://pharmacy.ky.gov/Pages/index.aspx. When a user selects "get more info" under the Online Vertification tab on the main webpage, they are taken to the search webpage. A user can search for authorized licensed wholesalers by selecting "drug facility" under the license/permit type and "wholesaler" as the classification.

[2] "Compounding" generally refers to a practice in which a licensed physician or licensed pharmacist – or in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist – combines, mixes, or alters ingredients of a drug to create a medication. The Federal Food Drug Cosmetic Act exempts compounders from complying with some statutory requirements provided that they meet certain conditions. These exemptions are codified in Section 503A of the Act [21 U.S.C. § 353a] for licensed pharmacies compounding drugs pursuant to individual prescriptions and in Section 503B of the Act [21 U.S.C. § 353b] for "outsourcing facilities"

drugs from bulk drug substances that meet specific requirements and are manufactured in FDA registered facilities. *Information for Outsourcing Facilities*, FDA.GOV, https://www.fda.gov/drugs/human-drug-compounding/information-outsourcing-facilities (last visited July 28, 2025); [PSR ¶ 10]. Drugs compounded by outsourcing facilities must comply with current good manufacturing practice requirements. *Id.* The FDA inspects them. *Id.* These facilities are required to provide information about their drugs and report adverse events to the FDA. *Id.*

Drugs compounded by outsourcing facilities also have label requirements to ensure patient safety. The labels must identify the drugs as compounded drugs; include the name, address, and phone number of the outsourcing facility; and list the lot or batch number, dosage form, strength, volume, date compounded, expiration date, storage and handling instructions. 21 U.S.C. § 353b(a)(10)(A)(i). The FDA maintains an updated and easy-to-use electronic list of all registered outsourcing facilities in the U.S.[3] Outsourcing facilities cannot make "an essential copy" of FDA-approved drugs unless the drug is on the drug shortage list. 21 U.SC. § 353b.

Although licensed physicians and state-regulated pharmacies[4] can compound drugs for

---

registered with FDA. Both 503A and 503B compounding pharmacies play a role in delivering tailored medications: 503A focuses on patient-specific prescriptions under state board oversight, while 503B facilities generally produce larger batches under stricter FDA regulations and oversight. Key to both frameworks is that they provide some level of oversight, either federally or by the State.

[3] As of July 21, 2025, 93 outsourcing facilities in the U.S. registered with the FDA. The full list can be found at the following link: https://www.fda.gov/drugs/human-drug-compounding/registered-outsourcing-facilities.

[4] The Kentucky Board of Pharmacy's user-friendly licensure verification search function also allows a user to quickly determine if a pharmacy is licensed in Kentucky. When a user selects "get more info" under the Online Vertification tab on the main webpage, they are taken to the search webpage. A user can search for licensed pharmacies by selecting "pharmacy" under the license/permit type and either "clinical practice pharmacy" or "clinical practice pharmacy – non-resident" as the classification.

specific individual patients, they must still comply with certain FDA regulations to mitigate risk to patients. First, a physician or pharmacist can only compound a drug from bulk ingredients that are manufactured by an FDA-registered facility. [PSR ¶ 10]. Second, the bulk ingredients used by the physician or pharmacist must be accompanied by a certificate of analysis. *Id.* These requirements protect patients by requiring that doctors and pharmacists use safe ingredients subject to FDA inspection and oversight. Compounding prescriptions must be tailored to a specific identified patient. 21 U.SC. § 353a. Ordinarily, state-regulated compounding pharmacies and physicians cannot make copies of commercially approved drugs in large quantities. *Id.*

During FDA declared drug shortages, the safety requirements that physicians and pharmacists must comply with are not relaxed. Instead, outsourcing facilities, compounding pharmacies, and physicians are often authorized to make copies of FDA approved drugs to increase the availability of the drug to meet patient need. 21 U.SC. § 353b. The physicians and pharmacists must still obtain active ingredients that are manufactured in bulk from an FDA-registered facility subject to FDA inspections.

## II. SENTENCING FACTORS ANALYSIS

Dr. Lewis's total offense level is thirteen. [PSR ¶ 31]. Dr. Lewis's criminal history category is I. [PSR ¶ 36]. Accordingly, his advisory sentencing guideline range is 12 to 18 months of imprisonment. [PSR ¶ 69]. Dr. Lewis should receive a 15-month sentence of incarceration. A 15-month sentence accounts for Dr. Lewis's history and characteristics – outlined in his sentencing memorandum – his gamble with patient health for profit, and the need to deter other trusted physicians from engaging in this dangerous, criminal behavior.

### A. Dr. Lewis's serious offense jeopardized patients' health and safety.

For approximately nine months, Dr. Lewis, a licensed physician, operated a weight loss

4

clinic. [PSR ¶ 12]. Dr. Lewis stopped his weight loss clinic on February 29, 2024 – the day the Kentucky Board of Pharmacy seized unapproved, misbranded semaglutide from his clinic. [PSR ¶¶ 7, 13]. Semaglutide is the active ingredient in three FDA-approved drugs, Ozempic, Rybelsus, and Wegovy, which improve blood sugar levels in adults with type 2 diabetes and promote weight loss. [PSR ¶ 11].

Dr. Lewis fraudulently operated his weight loss clinic using prescription drugs that violated federal law. [PSR ¶¶ 9-17]. As a licensed physician, Dr. Lewis generally was required to obtain FDA-approved commercially available prescription drugs from licensed wholesalers for office use. [PSR ¶¶ 9-10]. He did not do so. [PSR ¶¶ 9-17].

Had Dr. Lewis purchased FDA-approved semaglutide drugs, i.e. Ozempic, Rybelsus, and Wegovy, through the legal supply chain, the drugs would have contained labels containing critical information. For example, the name and place of business of the manufacturer, packer, or distributor required under 21 U.S.C. § 352(b) provides the FDA and other regulatory authorities a contact in case there is an issue with the drug. Likewise, the requirement that labels bear lot numbers identifying the drug's manufacturing history allow for the FDA and the manufacturer to alert the public when contamination or other issues are identified during routine surveillance. Lot numbers are particularly important should FDA need to institute a recall or inform the public of a health hazard. *See* 21 U.S.C. § 352(c), 21 C.F.R. §§ 201.18, 211.130(c).

Other information required on the labeling would have benefitted Dr. Lewis himself. The name and quantity of each active and inactive ingredient and expiration date assure the prescriber that he is administering the correct product and dose, as well as one that has the required potency. *See* 21 U.S.C. § 352(e)(ii), 21 U.S.C. § 352(c) , 21 C.F.R. §§ 201.17, 211.137. Moreover, the fact that a drug is FDA-approved and obtained from the tightly controlled legal supply chain gives a

prescriber the peace of mind that the drugs he is injecting into his patients were made in an FDA-inspected facility according to good manufacturing practice, are what they purport to be, and meet sterility and potency standards. It is the closest thing a patient can get to a guarantee that the product being injected into their bodies is at least what it represents and has been tested for sterility, potency, and efficacy. Dr. Lewis ordered drugs from websites that did not offer any of those assurances. [PSR ¶¶ 13-14].

Because the FDA added injectable semaglutide drugs – Wegovy and Ozempic – to the drug shortage list in 2022, physicians could have also obtained essential copies of those semaglutide injectable drugs from (1) FDA-registered outsourcing facilities, (2) state-regulated compounding pharmacies for a specific individual, or (3) by compounding the drugs themselves using qualified ingredients. If a physician obtained drugs through one of these avenues, the drugs would have been exempted from, among other things, needing FDA-approval. However, these alternative avenues to obtain semaglutide drugs still include FDA safeguards.

As previously noted, FDA-registered outsourcing facilities are inspected by the FDA and are required to comply with current good manufacturing practice requirements. The compounded drugs also are required to be labeled with much of the same information required in a label for FDA approved drugs including, among other things, the name and address of the outsourcing facility, the established drug name, the dosage and strength, the expiration date, and a lot number in case there are issues with specific batches. Outsourcing facilities also have an obligation to provide information, including adverse events, to the FDA. *Information for Outsourcing Facilities*, FDA.GOV, https://www.fda.gov/drugs/human-drug-compounding/information-outsourcing-facilities (last visited July 28, 2025); [PSR ¶ 10].

Pharmacies and physicians compounding prescriptions for individual patients must use

bulk or active pharmaceutical ingredients that are accompanied by a certificate of analysis and obtained from FDA-registered manufacturers. 21 U.S.C. § 353a(b)(1)(A). State law governs the practice of pharmacy – to include labeling and record keeping – and state boards of pharmacy provide oversight.

Despite having three legal ways to obtain drugs – even those in shortage – for his clinic, Dr. Lewis did none of them. He did not compound semaglutide himself. [PSR ¶¶ 12-17]. He did not legally purchase semaglutide drugs from an FDA-registered outsourcing facility for office use. *Id.* He did not write prescriptions for individual patients to be filled at state-regulated compounding facilities. *Id.* Instead, he chose to obtain drugs for his weight loss clinic through "research chemical" companies he found on the internet.

Dr. Lewis's clinic injected patients with non-FDA approved prescription drugs that had not ever been subject to any FDA regulatory oversight. [PSR ¶ 13]. Dr. Lewis first began purchasing non-FDA approved semaglutide from Swole as Fuck Research (SAF Research). *Id.* Later, Dr. Lewis switched his semaglutide supplier to Stone Mountain Research because Stone Mountain Research sold semaglutide for one-fourth the amount of SAF Research's price. [PSR ¶ 14]. Neither SAF Research nor Stone Mountain Research were FDA-registered drug manufacturers, FDA-registered outsourcing facilities, nor FDA-registered bulk manufacturers. [PSR ¶¶ 13-14]. The labels on the semaglutide vials from Stone Mountain Research warned: **"THIS CHEMICAL IS INTENDED FOR LAB RESEARCH AND DEVELOPMENT ONLY. NOT FOR HUMAN USE."**[5]

---

[5] Kentucky's Cabinet for Health and Family Services – Office of Inspector General took these photos of semaglutide recovered from Dr. Lewis's weight loss clinic.



Dr. Lewis's drugs bore labels that failed to include adequate directions for use, adequate warnings, an expiration date supported by stability studies, a list of active and inactive ingredients, and the quantities of the ingredients. [PSR ¶¶ 16]. If a patient reported adverse side effects or if a vial was contaminated, the FDA would have been unable to trace the drug's manufacturing history or even readily identify the address of the manufacturer.

Dr. Lewis knew that he obtained semaglutide from outside the FDA-regulatory framework. [PSR ¶ 15]. Dr. Lewis paid for the semaglutide he purchased from SAF Research, the first unauthorized provider, via Venmo – a smartphone application that is typically used for peer-to-peer transactions. *Id.* Venmo requires a user to specify the purpose of the payment. Instead of stating that the transactions were for semaglutide purchases, Dr. Lewis specified that his payments to SAF Research were for "meal prep" followed by the order number. *Id.*

Dr. Lewis concealed from his patients that his weight loss clinic injected them with non-FDA approved drugs. [PSR ¶ 17]. Patients were not informed that the clinic injected them with non-FDA approved drugs. *Id.* Patients interviewed by law enforcement all stated that they were unaware that the drugs were not FDA-approved. *Id.* All five patients stated that had they known

they were to receive non-FDA approved drugs, they would not have agreed to receive them.

In roughly nine months, Dr. Lewis's weight loss clinic's gross receipts were $249,044.40. [PSR ¶ 18]. He earned approximately $27,667 per month in gross receipts from his criminal and fraudulent actions.

Dr. Lewis's sentence needs to reflect the seriousness and dangerousness of his offense. This is not a victimless crime. He undermined patient trust and risked patient health. In a victim impact statement submitted to this Court, one former patient expressed feelings of betrayal and regret:

> Now, looking back at all the deceitful coverups, I feel stupid and betrayed for having trusted. Not just the before mentioned abnormalities, but also what has been publicly reported such as Dr. Matthew Lewis purchasing these drugs over the phone and classifying as meal prep. He knowingly purchased from non-FDA approved or non-licensed facilities. Also, a clear warning on the containers that it was for lab research and development only. Had I known any of this, I would not have taken this treatment at Lewis Family Care. Had I just known.
>
> His guilty plea should make it clear, he used an unsafe drug intentionally for profit. I have no idea what was given to me or the effects, so my health and future are compromised.

This former patient's statement underscores why doctors must obtain drugs through legal channels. Dr. Lewis's semaglutide drugs are untraceable. This patient will never know if a compromised, dangerous drug caused adverse side effects.

**B. The sentence must promote respect for the law.**

Dr. Lewis was very capable of earning a living and running a business without violating the law, yet during approximately nine months, he decided to put profit over patient health and ran a weight loss clinic utilizing illegally obtained drugs within his family care practice. He stopped the clinic when law enforcement visited his medical practice.

9

A sentence that includes active incarceration will promote respect for the law. The United States acknowledges that Dr. Lewis faces collateral consequences due to his own criminal actions. However, often high-earning and well-educated defendants face the greatest financial loss after a felony conviction. Dr. Lewis's collateral consequences do not undermine the need for his sentence to promote respect for the law. This Court should impose a sentence that establishes no one is above the law, including physicians.

**C. A sentence that includes imprisonment will deter Dr. Lewis and others.**

General deterrence of other licensed physicians and medical workers, who might consider risking patient health for profit by obtaining prescription drugs outside the FDA-regulatory framework, is equally as important as specific deterrence in this case. Patients need to be able to trust their physicians. From making decisions about vaccines to disease prevention to cancer treatment, physicians play a vital role in guiding patients through quality-of-life issues and health scares. American physicians, like Dr. Lewis, receive specialized degrees and often specialized training during residency and fellowship programs, so they have the medical expertise to treat patients. When physicians intentionally and fraudulently violate the law, they undermine the entire doctor-patient relationship and the practice of medicine.

They also risk the health and safety of their patients. The consequences of injecting patients with non-FDA approved prescription drugs are high. When physicians use drugs on humans that bear labels stating, "**NOT FOR HUMAN USE**," they have no idea if the vials are contaminated due to unsanitary manufacturing conditions or contain the active and inactive ingredients they purport to contain. Simply put, doctors who inject these drugs into patients gamble with their patients' lives.

A sentence that involves little imprisonment in Dr. Lewis's case is not sufficient to establish adequate deterrence for future licensed physicians who might consider similar criminal actions.

**CONCLUSION**

For the foregoing reasons, the United States respectfully asks that the Court sentence the defendant to the midpoint of the advisory guideline range – 15 months.

Respectfully submitted,

PAUL C. McCAFFREY
ACTING UNITED STATES ATTORNEY

By: /s/ Brittany A. Dunn-Pirio
Brittany A. Dunn-Pirio
Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507-1612
(859) 685-4888
Brittany.Dunn-Pirio@usdoj.gov

**CERTIFICATE OF SERVICE**

On August 5, 2025, I electronically filed this document through the ECF system, which will send notice to counsel of record.

/s/ Brittany A. Dunn-Pirio
Assistant United States Attorney